UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

vs.                                                          Case No. 8:08-CR-404-T-27MAP

TAM FUK YUK
CHUN HEI LAM
YOU XUAN ZHENG
DONG MING MOA
CHAO NAN CHEN
GUO CHANG TAN
JIAN LI TAN
_____/

**ORDER**

**BEFORE THE COURT** are Defendant Tam Fuk Yuk's Motion to Dismiss Indictment for Lack of Subject Matter Jurisdiction (Dkt. 90), the Government's opposition (Dkt. 107), and Defendant Tam Fuk Yuk's Motion to Suppress All Physical Evidence and Statements (Dkt. 91), and the Government's opposition (Dkt. 105). Upon consideration, and after conducting an evidentiary hearing and hearing argument of counsel, Defendant Tam Fuk Yuk's Motion to Dismiss Indictment for Lack of Subject Matter Jurisdiction (Dkt. 90) is DENIED. Defendant Tam Fuk Yuk's Motion to Suppress All Physical Evidence and Statements (Dkt. 91) is DENIED.

**Subject matter jurisdiction**

Pursuant to the MDLEA, foreign registered vessels over which the flag nation consents or waives objection to enforcement of United States law by the United States are subject to the jurisdiction of the United States. 46 U.S.C. App. § 1903(c)(1)(C). Under the MDLEA, whether the United States has jurisdiction over a vessel is not an element of the underlying criminal offense, but

a question of law to be determined exclusively by the court. See 46 U.S.C. App. § 1903(c)(1)(C); *United States v. Tinoco*, 304 F.3d 1088, 1116 (11th Cir. 2002); *United States v. Rendon*, 354 F.3d 1320, 1328 (11th Cir. 2003). The consent of a foreign nation to the enforcement of United States law by the United States with respect to a vessel registered in that foreign nation is "conclusively proved by certification of the Secretary of State or the Secretary's designee." 46 U.S.C. App. § 1903(c)(1); *United States v. Tinoco*, *supra* at 1114-15 (declaration of Secretary of State's designee constitutes *prima facie* evidence that vessel was without nationality).

The MDLEA prohibits drug trafficking by individuals aboard a "vessel subject to the jurisdiction of the United States." 46 U.S.C. app. § 1903(a). A vessel subject to the jurisdiction of the United States includes a "vessel without nationality." *Id.* § 1903(c)(1)(A).[1] Relevant to this case, a "vessel without nationality" is defined as:

(A) a vessel aboard which the master or person in charge makes a claim of registry, which claim is denied by the flag nation whose registry is claimed; and

(C) a vessel aboard which the master or person in charge makes a claim of registry and the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

46 U.S.C. app. § 1903(c)(2). *See United States v. Tinoco,* 304 F.3d 1088, 1102 (11th Cir. 2002).

"Under the Convention on the high Seas, a ship is required to sail under the flag of only one state and is subject to the exclusive jurisdiction of that state while on the high seas." *United States v. Ayarza-Garcia,* 819 F.2d 1043, 1046 (11th Cir. 1987), *cert. denied,* 484 U.S. 969 (1987).[2] Accordingly, under the Convention, a vessel which sails under the authority of two states, and uses

---

[1] Now 42 U.S.C. § 70502 (d)(1).

[2] An unrelated holding in *Ayarza-Garcia* was superseded by statute as discussed in *United States v. Tinoco*, *supra.*

them for convenience, or falsely claims a nationality other than that of the country in which it is registered, will be deemed assimilated to statelessness. *Id.* Likewise, a vessel which flies the flag of one nation and claims nationality under another will be deemed a stateless vessel under Article 6 of the Convention. *United States v. Batista,* 731 F.2d 765, 767 (11th Cir. 1984); *United States v. Gonzalez,* 810 F.2d 1538, 1541 (11th Cir. 1987). A vessel which claims more than one nationality "is deemed to be stateless; i.e., a vessel assimilated to a vessel without nationality." *United States v. Alvarez-Mena*, 765 F.2d 1259, 1264 n.8 (5th Cir. 985). Finally, the absence of "a permanent indicia of name and home port on [a vessel's] hull is also a clear indication that the crew wanted to be able to manipulate the vessel's 'nationality' on short notice," "thereby rendering the vessel 'stateless.'" *United States v. Gonzalez,* 810 F.2d at 1542 (*quoting United States v. Matute,* 767 F.2d 1511, 1512-13 (11th Cir. 1985)).

The TAM FUK YUK was flying only the flag of Panama. Neither its home port nor name was painted on its hull. When the inflatable approached the TAM FUK YUK, the Captain of the vessel identified himself and presented documents to the inflatable's crew. The first document referenced Panama. Petty Officer Antis pointed to the Panamanian flag and asked "Panama?" The Captain responded "Yes, Panama." Antis interpreted this to be a verbal claim of nationality by the captain. Likewise, Antis understood that flying the Panamanian flag was a claim of nationality. Finally, the documents produced by the Captain included a reference to the registered owner being in Hong Kong and a statement that the vessel was registered in the PRC (People's Republic of China).

When the USS De Wert approached the F/V TAM FUK YUK, it was under way approximately 215 nautical miles off Manta, Ecuador on a south-southwest course heading away

from South America. There were no identifying marks on its hull, other than some Chinese letters and English numbers. When asked, the Captain made a verbal claim of Panama as the vessel's nationality. Moreover, he produced documents which indicated that the vessel was registered either in Hong Kong or China. Verbal claims of nationality, flying its nation's flag and possession and production of documents evidencing the vessel's nationality are the accepted claims of nationality. 46 U.S.C. § 70502(e) (formerly 46 U.S.C. app. §1903). Based on the lack of identifying markings on the vessel's hull, the Panamanian flag, the captain's multiple claims of nationality, and the inconsistencies attendant to those claims, the vessel was properly deemed assimilated to statelessness, and therefore was a vessel without nationality, subject to United States jurisdiction.

Alternatively, the evidence conclusively establishes, through the certifications introduced into evidence, that the governments of Panama, Hong Kong and China either could not confirm or deny, or, as to China, expressly denied that the TAM FUK YUK was registered there when interdicted by the De Wert. That the Chinese denial was received in December 2008, after the boarding and search, is irrelevant. *See United States v. Mena*, 863 F.2d 1522, 1533 (11th Cir.)(upholding jurisdiction where Coast Guard boarded and searched foreign ship and arrested crew before receiving flag nation's consent), *cert. denied*, 493 U.S. 834 (1989); *United States v. Reeh*, 780 F.2d 1541, 1547 (11th Cir. 1986)(that consent to board was received after boarding had taken place "makes no constitutional difference."); *United States v. Khan*, 35 F.3d 426, 430 (9th Cir. 1994)(no authority for argument that United States lacked jurisdiction or violated due process because Coast Guard boarded ship before receiving permission of flag nation.); *United States v. Robinson*, 843 F.2d 1, 4 (1st Cir. 1988), *cert. denied,* 488 U.S. 834 (1988)*; United States v. Gonzalez*, 776 F.2d 931, 934 (11th Cir. 1985) (same).

Accordingly, Defendant Tam Fuk Yuk's Motion to Dismiss Indictment for Lack of Subject Matter Jurisdiction (Dkt. 90) is DENIED.

### *Reasonable suspicion to board and search the F/V TAM FUK YUK*

In his Motion to Suppress (Dkt. 105), Defendant Tam Fuk Yuk contends that "the Coast Guard lacked reasonable suspicion that the vessel was engaged in a violation of the laws of the United States." (Dkt. 105, p. 2-3).[3] Based on the testimony and exhibits presented, this Court disagrees. Based on the totality of the circumstances, the Coast Guard had a particularized and objective basis for suspecting that the F/V TAM FUK YUK was engaged in drug trafficking on the high seas, in violation of United States law. There is no evidence of pretext.

Under the Fourth Amendment, the Coast Guard may stop and board a foreign vessel in international waters if it has a reasonable suspicion that the vessel is engaged in activity that violates United States law. *United States v. Tinoco,* 304 F.3d 1088, 1116 (11th Cir. 2002); *United States v. Aguilar,* 286 Fed.Appx. 716, 721-22 (11th Cir. 2008). In assessing whether reasonable suspicion existed, the totality of the circumstances are considered. *Tinoco,* 304 F.3d at 1116. While there must be an objective basis for suspicion of criminal conduct, the officers' subjective assessment of the facts made in light of their training, expertise, and experience in the field may be considered. *Id*. "Reasonable suspicion exists, . . . if the cumulative information of which the detaining officer is aware suggests criminal activity, even if each fact, viewed in isolation, can be given an innocent

---

[3] As there was reasonable suspicion for the boarding and search of the vessel, it is unnecessary to decide whether the Fourth Amendment applies. *See United States v. Aguilar,* 286 Fed.Appx. at 722 n.6 ("We recognize *Tinoco* did not cite *Verdugo-Urquidez* and no argument was made that the Fourth Amendment did not apply. However, because there was reasonable suspicion here, we need not analyze whether our prior panel precedent rule forecloses us from doing anything other than following *Tinoco*.") (discussing *United States v. Tinoco,* 304 F.3d 1088 (11th Cir. 2002), *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) and *United States v. Bravo,* 489 F.3d 1, 8-9 (1st Cir.), *cert. denied*, 128 S.Ct. 344 (2007) (Based on *Verdugo-Urquidez,* Fourth Amendment does not apply to search of foreign vessel with alien crew in international waters)).

explanation." *Id*.

Applying this standard, the Coast Guard had reasonable suspicion that the F/V TAM FUK YUK was engaged in drug trafficking activities. On the evening of September 17, 2008, personnel from the USS De Wert observed two radar contacts in the eastern Pacific ocean in an area known for drug trafficking. One contact, heading west bound, stopped. The second contact approached the first from the northeast. The two contacts became one, indicating that the two vessels were along side each other. After an hour and a half, the two contacts separated. One headed toward shore and the other southwest, consistent with a route south of the Galapagos Islands, before it turned northbound. This activity was consistent with a drug transfer at sea. The USS De Wert pursued the second contact, as its heading was typical of a vessel with drugs.

As the USS De Wert closed in on what was later identified as the F/V TAM FUK YUK, the officers observed that the vessel was flying the flag of Panama but had no home port painted on its stern or other identifying markings, other than what appeared to be Chinese lettering and English numbers. The vessel was underway, lights were on in the pilot house and individuals could be seen in the pilot house. The De Wert attempted to contact the vessel, using international channel 16, to no avail. The De Wert made numerous attempts in English and Spanish to contact the vessel. There was no response. The De Wert pulled within a few hundred yards of the vessel, fully lighted, and sounded its danger signal, to no avail. After 15 to 20 minutes, a rigid inflatable was launched from the De Wert to conduct a "right of approach."[4]

---

[4] Under international maritime law, a nation's warship may hail and board an unidentified vessel to ascertain its nationality. *United States v. Romero-Galue,* 757 F.2d 1147, 1149 n.3 (11th Cir. 1985). This principle of international maritime law is codified by article 22 of the Convention on the High Seas, to which the United States is a signatory. *Id*. If after a right of approach is exercised, suspicions as to the nationality of the vessel persist, the inquiring nation may board the vessel and conduct a search for registration documents in order to verify the vessel's nationality. *Id*.

As the inflatable came along side the vessel, the crew of the TAM FUK YUK appeared. In English and Spanish, the officers asked who the captain was. One individual (Mr. Lam) responded in English, "Yes, Captain" and handed a pink folder to the inflatable. In the folder were several documents (Gov. Exh. 2 (a)-(g)). The first document was Panamanian, appearing to be a fishing authorization. Petty Officer Antis pointed to the Panamanian flag the vessel was flying and Mr. Lam pointed to the flag and said, "Yes, Panama." Antis interpreted this to be a claim of Panamanian nationality.

During the right of approach questioning, an explosion aboard the FUK TUK YUK was heard and the officers observed smoke coming from the smoke stacks. Two of the crew members of the TAM FUK YUK ran toward the bridge. The officers offered assistance and requested permission to board. There was no response. The officers, concerned about fire, boarded the vessel to render assistance. They attempted to approach the engine room but the smoke was too thick. They summoned a fire and rescue team from the De Wert, which found a major exhaust leak coming from the starboard engine. Both engines were covered with excessive oil. The starboard engine was shut down. The documents produced by the Captain, in addition to the Panamanian document, included documents indicating that the vessel's owner was in Hong Kong and the vessel was registered in China. The De Wert attempted to contact Panama and Hong Kong. During this time, an initial safety inspection of the vessel was conducted.

During the safety inspection, and as they waited for tasking directives after contact with Panama and Hong Kong, the officers found that the overall condition of the vessel was "very poor," inconsistent with typical fishing vessels in that area of the eastern Pacific. There was excessive rust on the super structure, hull and all over the vessel. The flooring planks bowed as they walked the

deck. Rotten, dried fish were hanging over the deck. Lines and hooks were observed on deck but the long line reel in the forward deck was rusty and inoperable. The fish holds were rusty, decaying, and filled with 55 gallon drums containing gasoline, although the TAM FUK YUK ran on diesel. There was no ice in the holds and it appeared that the holds had never been used for fish. There was no bait on board. There was no fish odor or other indicia of fishing on the vessel, such as skin, scales or fish oil on the deck, which was not typical of an operating fishing vessel.

In general, the vessel was not set up for fishing and its overall condition was not typical of a working fishing vessel. Cockroaches, beetles and rats were observed "everywhere," an observation not typical of a working fishing vessel. The compartment in the crew's quarters, typically used to store food and dry goods, held more than 1000 gallons of free flowing gasoline. On deck, another compartment held free flowing gasoline. The amount of gas on board a diesel vessel was excessive, based on the officers' experience. The small generator and pump observed onboard would not require that much gasoline in the officer's view. A coolant system consisting of coils in the fishing holds was observed. Mr. Lam told the officers it was not working, and was cracked.

In sum, the course of the vessel when first observed on radar, its interaction with the other vessel under cover of darkness in an area known for drug trafficking, and its general condition gave rise to a reasonable suspicion that it was engaged in drug trafficking activities. Its failure to respond to the De Wert when first approached added to that suspicion, as did the rotten, dried fish hanging on the bow, the excessive amounts of gasoline on board, and all indications that the vessel was not set up for fishing. In sum, despite the attempt to make the TAM FUK YUK appear to be a fishing vessel, the officers had a reasonable, objective basis to conclude otherwise.

The officers were lawfully engaged in a legitimate "right of approach" with respect to an

-8-

unidentified vessel on the high seas which had not responded to the De Wert's attempts to hail it, including blasts from its horn, sirens and danger signals.  When they heard an explosion and observed smoke coming from the smoke stack of the vessel, indicating the possibility of a fire, they boarded to render assistance.  Once the vessel had been secured, they conducted an initial safety inspection.  After that inspection, during which they were able to observe and assess the general condition of the vessel, they remained on board pending responses from the governments of Panama and Hong Kong.  Only after receiving those responses was a full law enforcement search of the vessel conducted, during which the cocaine was found.

Reasonable suspicion that the vessel was engaged in drug trafficking existed.  There was no Fourth Amendment violation.  Defendant's Motion to Suppress (Dkt. 91) is DENIED.

**DONE AND ORDERED** in chambers this 22nd day of January, 2009.

*/s/James D. Whittemore*
**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record